**THOMAS JORDAN, Inc.**
v.
**MAYRONNE DRILLING MUD, CHEMI-
CAL & ENGINEERING SERVICE.
THE TJ–318.
No. 14995.**

United States Court of Appeals,
Fifth Circuit.
June 30, 1954.

Charles Kohlmeyer, Jr., New Orleans, La., Lemle & Kelleher, New Orleans, La., of counsel, for appellant.

Benjamin W. Yancey, New Orleans, La., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for appellee.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and RICE, District Judge.

RIVES, Circuit Judge.

This appeal in admiralty is taken from the District Court's decree awarding damages to appellee for the value of its cargo lost while being transported in the TJ–318, a barge chartered from the appellant. The principal questions presented are whether a certain provision of the charter party negatived any implied warranty of seaworthiness, so as to preclude recovery;[1] and whether, assuming the breach of a duty to furnish a seaworthy barge, the award is nevertheless unjustified because of alleged improper loading and unnecessary jettisoning of the cargo by appellee.

■ The material facts are largely stipulated, and substantially without dispute. Briefly, they reveal that on or about October 8, 1951, the general manager of appellee's plant at Harvey, Louisiana, Myers, telephoned appellant's vice-president, Cox, and asked whether a barge was available for the purpose of delivering appellee's merchandise to its customers.[2] Cox mentioned that the TJ–318 was available, whereupon Myers said he would look the barge over to see if it was suitable. On October 10th, Myers and Cox went on board the barge together, and in Cox's presence Myers made an examination to determine whether the barge was generally suited to appellee's hauling purposes. There was no direct testimony by Myers as to the extent of the inspection, but it was stipulated between the parties that he "would testify that he did not go into the tank spaces of the barge, did not inspect their interior and did not see any holes in the deck or the sides of the barge."[3] Cox conceded

in his testimony that Myers' examination was more or less cursory in nature, and mainly limited to the problem of removing certain structural protuberances on the deck "so that the mud truck could run aboard the barge without damage" for loading purposes. When Cox had the complained of deck condition remedied that same day, Myers telephoned him that the barge had been found acceptable, whereupon the charter agreement, consisting of a printed form prepared and furnished by appellant and containing the disputed inspection provision, was then executed by the parties.

The loaded barge was dispatched from the Harvey Canal into the Mississippi River on the night of October 11, 1951, in tow of the tug Agnes B. While en route to an oil well location down the Mississippi River and on the morning of October 12, the barge was discovered by the tug captain to be taking water and sinking by the stern. After reporting the difficulty to appellee and requesting help, he ran the barge aground, bow foremost, near Poverty Point in order to prevent her from sinking. Subsequent efforts to pump the water out proving unsuccessful and the danger of complete loss of both barge and cargo being considered imminent, it was found necessary to jettison part of the cargo, most of which was already seriously damaged by water. After the barge had been lightened by the jettisoning operation, it became possible to prevent further settling by the stern and to control the intake of water, so that the barge and remainder of the cargo could be salvaged. When the barge was returned to appellee's plant at Har-

1. The particular provision relied upon by appellant, and the only portion of the charter agreement here material, provides: "It is understood that the Charterer has had the Barge inspected and found same to be in first-class condition."

2. Appellee is a Louisiana partnership engaged in the business of selling drilling mud and other chemicals used to drill oil wells. As a sales service, it delivers its products to the locations desired by its customers.

3. This stipulation was made expressly

"subject to respondent's objection as to relevancy and admissibility", and appellant contends that no portion thereof is admissible to show the extent or lack of a sufficient inspection, insofar as it might tend to vary and contradict the written charter provision in violation of the parole evidence rule. We think it clear, however, that such provision does not render inadmissible testimony as to the circumstances known to both parties under which the disputed provision was inserted.

vey, Louisiana, and the remainder of the cargo discharged, a hole about two inches in diameter was found in the hull about two feet below the deck in the stern rake.

The District Court found that the hole in the barge "was the sole proximate cause of the sinking", and that it was "not discoverable from the deck by the character of examination made by Mr. Myers in Mr. Cox's presence aboard the Barge TJ–318 on October 10, 1951."; The Court concluded that the charter agreement implied a warranty of seaworthiness, which was not displaced or negatived by the provision as to appellee's inspection, and that the defenses of negligent loading and imprudent jettisoning of the cargo had not been proved. Decree was accordingly entered in favor of appellee for the value of the cargo lost, plus salvage expenses.

Appellant insists that the Court erred in permitting any recovery, since the inspection provision of the charter party either expressly negatived any warranty of seaworthiness, or estopped appellee from contending that unseaworthiness caused the loss; that, if such warranty nevertheless be implied in spite of the inspection provision, it did not extend to obvious and patent defects, such as the hole in this barge; alternatively, that appellee either assumed the risk of loss from its overloading of the barge, or that appellee's negligent action in prematurely jettisoning the cargo, instead of having it safely transferred to another barge as ordinary good seamanship required, was a sufficient circumstance to prohibit any recovery.

■■■ We think the District Court correctly held that the charter of the Barge TJ–318 carried with it an implied warranty of seaworthiness, and that, under the circumstances known to both parties, the provision "that the Charterer has had the barge inspected and found

same to be in first-class condition" was not so clear and unequivocal as would constitute a waiver of such warranty and the right to recover damages resulting from its breach. The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Patton-Tully Transp. Co. v. Barrett, 6 Cir., 37 F.2d 516; The Fred E. Hasler, 2 Cir., 55 F.2d 919; Dempsey v. Downing, 4 Cir., 11 F.2d 15. In view of the well settled rule in admiralty that "Exceptions in a * * * charter party, inserted by the shipowner for his own benefit, are unquestionably to be construed most strongly against him",[4] we do not think the provision regarding inspection, contained in the printed portion of the charter party form prepared and furnished by respondent, may fairly be construed as an agreement to waive or reduce the implied warranty of seaworthiness, particularly where, as here, the defect causing sinking and the resulting damage was found to be latent, and readily discoverable only by internal examination of the rake, rather than by the external deck examination contemplated by the parties.[5] See The Framlington Court, 5 Cir., 69 F.2d 300, 303; Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 783–784; Dempsey v. Downing, supra. On the basis of the facts found, which seem to us supported by the stipulation and oral testimony, we regard the language of the Fourth Circuit in the Downing case, supra, rejecting an argument strikingly similar to that of this appellant, as peculiarly applicable here:

"Counsel insist that, under the circumstances in this case, appellants should not be held liable for damages arising from the unseaworthiness of the barges, either upon the theory of an express or an implied warranty; their position being that the barges were accepted for the desired purpose by appellees, after full inspection on the part of

4. In Compania De Navigacion La Flecha v. Brauer, 168 U.S. 104, 118, 18 S.Ct. 12, 15, 42 L.Ed. 398.

5. The testimony reveals that the hole in the barge was readily discernible only by

going into the dark rake where the light could be observed shining through. As heretofore noted, Myers did not make this type examination when accompanied by Cox, a fact which Cox knew and the District Court found.

competent persons in their behalf, which, in effect, waived a warranty of seaworthiness of the barges. Doubtless there may be cases in which this would be true; that is, where full inspection was made by those seeking to charter the vessels, with a view of and for the purpose of learning their condition, and the alleged defects or weaknesses were either patent or were especially called to such charterers' attention by the vessel owners; but it does not appear to the court that the facts here warrant the acceptance of that doctrine. Sanford & Brooks Co. v. Columbia Dredging Co. [4 Cir.], 177 F. 878, 101 C.C.A. 92; Portsmouth Fisheries Co. v. John L. Roper Lumber Co. [4 Cir.], 269 F. 586, 588— both decisions of this court.

"It seems entirely clear to this court that neither party, by doing what was done in this case, meant to depart from the usual terms of a contract of hire of the barges. When shipowners contemplate the release of their vessels from liability, as affects the implied warranty of seaworthiness for the service undertaken, they should do so in plain and unequivocal terms. Upon failure in this respect, the liability arising from unseaworthiness exists, and it is only just and reasonable that this should be so." 11 F.2d at page 17.

■■ Furthermore, a review of the testimony convinces us that the Trial Court was justified in rejecting any inference of improper loading of the barge or imprudent jettisoning of the cargo as causing the loss, and in concluding instead that appellees should not be penalized for exercising their good faith judgment in a hazardous situation precipitated by the unseaworthy condition of the barge. We think the testimony supports the Court's finding that, even after the barge was run aground, there was still "grave and justified fear of loss of the barge and of all her cargo from the wave wash of ships passing nearby, and from the continued ingress of water through the submerged hold and submerged defective manhole gaskets." Under such circumstances, as the Trial Court appropriately observed, salvage operations involving the exercise of good faith judgment in an emergency should not "be narrowly scrutinized, weighed in delicate balance", and subjected to a strict hindsight review as to reasonableness of the action taken "on the basis of ex post facto criticism from persons not actually confronted with the decision in the emergency." See P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626, 634.

Affirmed.